IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MELISSA MITCHELL,

       Plaintiff,

  vs.


ABERCROMBIE & FITCH, CO.
    et al.,

       Defendants,

    and                          Case Nos. C2-04-306 and C2-05-596
                                  Judge Edmund A. Sargus, Jr.
CASEY FULLER,[1]                  Magistrate Judge Norah McCann King

       Plaintiff,

  vs.


ABERCROMBIE & FITCH, CO.
    et al.,

       Defendants.


## OPINION AND ORDER


In this consolidated, putative class action, Plaintiffs, Melissa Mitchell, Jennifer Frietsch and

Scott Oros, on behalf of themselves and similarly situated class members, allege that Defendants,

---

[1]     Plaintiff, Casey Fuller, is a Tennessee resident and a former Manager in Training, Assistant Manager and Store Manager of Abercrombie.  He brought a Complaint for Collective Action in the Eastern District of Tennessee alleging identical violations of the Fair Labor Standards Act as those asserted by the Plaintiffs in *Mitchell*.  On June 21, 2005, the District Court in Tennessee transferred the case to this district, where is was assigned case number 2: 05-cv-596.  On September 2, 2005, this Court consolidated *Fuller* with the *Mitchell* case for pretrial, discovery and trial purposes.  Defendants' Motions for Summary Judgment, however, relate only to the named Plaintiffs in the *Mitchell* case.

Abercrombie & Fitch Co. and Abercrombie & Fitch Stores, Inc. ("Abercrombie" or "Defendants"),
violated the Fair Labor Standards Act, 29 U.S.C. § 207(a) ("FLSA"), and the Ohio Minimum Fair
Wage Standards Act, O.R.C. § 4111.03(A), by failing to pay non-exempt Assistant Managers and
Managers-in-Training proper compensation for overtime. Plaintiffs also claim that Abercrombie
improperly classifies its Store Managers as exempt executives for purposes of evading the
requirement to pay them overtime.

On December 28, 2004, this Court denied Defendants' Motion to Dismiss the Plaintiffs'
claims under Federal Rule of Civil Procedure 12(b)(6), declining to exercise the option of converting
the Motion to Dismiss to one for summary judgment. The parties have now completed the necessary
discovery on the issues relating to overtime compensation. The matter is now ready for disposition
under Federal Rule of Civil Procedure 56. Thus, before the Court are Defendants' separate Motions
for Summary Judgment against each of the three named Plaintiffs on all of their claims. For the
reasons that follow, Defendants' Motion for Summary Judgment on the Claims of Jennifer Frietsch
is granted; Defendants' Motion for Summary Judgment on the Claims of Melissa Mitchell is granted;
and Defendants' Motion for Summary Judgment as to Plaintiff Scott Oros' Claim Under Count One
of the Amended Complaint is granted.

**I.**

Defendants, Abercrombie & Fitch Co. and Abercrombie & Fitch Stores, Inc., operate over
800 retail clothing stores throughout the United States selling specialty clothing for men, women and
children. Although the stores vary in location, size, volume, and staffing patterns, most
Abercrombie stores employ a Store Manager, at least one Assistant Manager, and, depending on the
store, at least one Manager-in-Training ("MIT"), who trains to become an Assistant Manager. In

-2-

addition, most Abercrombie stores employ a large number of part-time hourly employees as sales associates.

Abercrombie classifies its Store Managers as "exempt" from the overtime requirements of the FLSA and pays no compensation to them for ours they work in excess of 40 per week. (Routh Aff. at ¶ 3.) Abercrombie classifies Assistant Managers and MITs as "non-exempt" for the purposes of the overtime requirements of the Fair Labor Standards Act. (Routh Aff. at ¶ 4.) Plaintiffs maintain that the FLSA, 29 U.S.C. § 207(a), and Ohio Minimum Fair Wages Standards Act, O.R.C. § 4111.03, require Abercrombie to compensate these employees for each overtime hour worked at a rate not less than one and one-half (1.5) times their regular hourly rate. Plaintiffs allege that instead of paying 1.5 times the employees' hourly rate, Abercrombie paid Assistant Mangers and MITs hourly "Supplemental Pay," or more particularly, only half (.5) their hourly rate, for overtime hours worked above 40 hours per week. Abercrombie calculated the hourly Supplemental Pay by dividing the employee's weekly salary by 40 and then by 2, to arrive at an hourly rate to be paid for each hour worked in excess of 40 each week. (Routh Aff. at ¶ 5.)

Plaintiff, Scott Oros, resides in Westlawn, Pennsylvania. Oros worked for Abercrombie at its Streamtown Mall store in Scranton, Pennsylvania beginning on January 1, 2003 initially as a MIT, then as an Assistant Manager and finally, beginning in June, 2003, as a Store Manager where he remained until his resignation in October, 2003.[2] When Oros applied for the position as an MIT,

---

[2]      By Opinion and Order dated May 17, 2005, the Court dismissed Oros' claim in Count II of the Amended Complaint under the Ohio Minimum Fair Wage Standards Act, O.R.C. § 4111.03, essentially because Oros never worked nor resided in the State of Ohio. Subsequently, on November 8, 2005, the Court permitted Plaintiffs to amend their Complaint to assert a claim on behalf of themselves and a collective class to assert state law fair labor claims under the laws of the state in which the individual putative Plaintiff worked for Abercrombie. The Court found that the issue of whether these Plaintiffs may properly pursue claims on behalf of a class of plaintiffs whose claims arise under the laws

District Manager Sarah Nicholson interviewed him. During his pre-hire interview, Nicholson informed Oros that is he was employed as an MIT, he would earn a salary and would be paid Supplemental Pay, that is, half of his salary's hourly rate-equivalent for any time he worked in excess of 40 hours. (Oros Dep. at 45-50.) Oros' starting annual salary was $23,000, or $442.31 per week. (Routh Aff., ¶ 7.) Oros believed that the Supplemental Pay was "like a bonus" for time worked in excess fo 40 hours. (*Id*. at 49.)

After he completed the MIT program, Oros was promoted to Assistant Manager at the Scranton store. He continued to be paid on a salary basis plus Supplemental Pay. In June 2003, Oros transferred to the Oxford Valley store near Philadelphia and was promoted to the position of Store Manager. After two months, he transferred to Abercrombie's Allentown store, where he was the Store Manager for approximately three to four months until the end of his employment in early October 2003.[3]

Plaintiffs Melissa Mitchell and Jennifer Frietsch, also former employees of Abercrombie, each began as MITs and subsequently advanced to Assistant Managers. Unlike Oros, neither Mitchell nor Frietsch ever worked as a Store Manager.

---

of another state should await resolution in the context of motions for certification.

Accordingly, Defendants have moved for summary judgment as against Oros only as it relates to his federal claim under the FLSA. Moreover, Defendants have not moved for summary judgment, nor could they, on the claims arising under the various and as of yet unidentified state fair labor standards laws that could be implicated by the Amended Complaint.

[3]     Additional facts relating to Oros' claim that Abercrombie did not pay him overtime because it improperly classified him and all Store Managers as "exempt" from overtime requirements are set forth below with a full discussion of the Executive Exemption under the FLSA. *See*, *infra*, Section III, C.

Jennifer Frietsch first applied for employment with Abercrombie in the Summer of 1998 and began working as a part-time Brand Representative.[4] After the Summer of 1998, Frietsch continued to work part-time as a Brand Representative for Abercrombie, primarily at its Kenwood mall near Cincinnati, Ohio, during summers and holiday seasons in 1998, 1999 and 2000. (Frietsch Dep. at 28-34.) In October 2001, after Frietsch graduated from college, she was recruited by Bill Leifheit to apply for a job as a MIT. Leifheit offered Frietsch a position as a MIT at an annual salary of $24,000. Frietsch was told on her first day of employment as a MIT that she was going to be paid a salary, and an additional half-time rate when she worked over 40 hours in a week. (Frietsch Dep. at 70.) Frietsch thought that Supplemental Pay was a bonus she would receive for working so much. (Frietsch Dep. at 194.) After she completed the MIT training program, Frietsch was promoted to Assistant Manager in December 2001. Although she received an increase in pay, the manner in which she was paid did not change. (Routh Aff. at ¶ 6, Exh. 3.) Frietsch resigned her employment in or about December, 2002.

Melissa Mitchell applied for employment with Abercrombie after she was recruited by her friend and co-Plaintiff, Jennifer Frietsch, who was then an Assistant Manager with Abercrombie. District Manager Bill Leifheit interviewed Mitchell for a position as a MIT. During this initial pre-hire interview, as he had done with Frietsch, Leifheit discussed compensation with Mitchell and informed Mitchell that if she was employed with Abercrombie as a MIT and an Assistant Manager, she would earn a salary, and, in addition, that she would earn half of the salary's hourly rate equivalent for any time worked in excess of 40 hours in a workweek. (Mitchell Dep. at 52, 118.)

---

[4]     A Brand Representative greets and assists customers, re-folds and re-stocks merchandise, works the cash register, and assists with shipment. (Frietsch Dep. at 30.)

Mitchell also considered Supplemental Pay as a bonus and a means for Abercrombie to demonstrate that it valued its employees. (Mitchell Dep. at 232.) Mitchell was eventually hired as a MIT into Abercrombie's store in the Kenwood mall near Cincinnati, Ohio. After she completed the MIT training, Mitchell was promoted to Assistant Manager. She received an increase in pay, but the manner in which she was paid did not change. (Routh Aff. at ¶ 6, Exh. 2.) Mitchell resigned her employment in December, 2002.

At their new job orientation, Oros and Mitchell received and signed an Orientation Checklist which contained a section that states "**Assistant Manager Pay (in non-California states)** – Assistant Managers receive a weekly base salary for all hours worked each week. Hours over 40 per week are paid at the Supplemental Pay rate." (Oros Dep. Exh. 2; Mitchell Dep. Exh 2.)[5] The Orientation Checklist then made a reference to the page in the Associate Handbook where more information could be found regarding Supplemental Pay. Oros, Mitchell and Frietsch also received a copy of the Associate Handbook at the time they were hired:[6]

> **ASSISTANT MANAGER PAY AND SUPPLEMENTAL HOURS (NON-CALIFORNIA)**
> Assistant Managers receive a weekly base salary for all hours worked each week. This is computed and reflected on paychecks at an hourly rate. Managers-in-Training, Trainees and Assistant Managers working in states other than California are eligible for hourly Supplemental Pay for hours "worked" in excess of 40 each week. "Hours Worked" include the following: regular, meeting in store/meeting out of store, inventory, management training, injury, new store opening, sick. An hourly Supplemental Pay rate is calculated by dividing the Assistant Manager weekly base salary by 40 and then by 2, to arrive at an hourly rate to be paid for each hour worked

---

[5]     Frietch does not recall the Store Manager going over the Orientation Checklist when she first began working. Moreover, while her Store Manager signed the document, Frietch did not sign the Orientation Checklist. (Frietch Dep. at 61-62, Exh. 3.)

[6]     Oros and Mitchell indicate that they skimmed the handbook (Oros Dep. at ; Frietch recalls reading the handbook after she was hired. (Frietch at 66.)

in excess of 40 each week.

> Example: $480 weekly base salary
> divided by 40 = $12.00 equivalent hourly rate
> divided by 2 = $6.00 Supplemental Pay rate

All benefit hours must be paid on 8 straight time hours. Benefit hours, excluding sick pay, will not count as hours worked or accumulate towards the calculation of supplemental pay. Hours worked on a holiday must be paid based on 8 straight hours (this is in addition to the 8 hours of holiday pay). Only hours worked and sick pay hours are to be accumulated towards the calculation of supplemental pay. Benefit hours include emergency absence, vacation, holiday, personal day, and jury duty.

(Mitchell Dep. Exh. 5; Frietsch Dep. Exh. 4.; and Oros Dep. Exh. 5)

During their employment as MITs and Assistant Managers, Plaintiffs were responsible for providing orientation to newly-hired employees. They were also responsible for providing an Orientation Checklist and a Handbook to each new employee and for enforcing the policies contained therein.

As MITs and Assistant Managers, Plaintiffs were scheduled to work a fixed, pre-set five day, 45 hour workweek and did not, as a matter of company policy, work fewer than 40 hours per week. Abercrombie's policy regarding workweeks for store managers was memorialized in an internal memorandum titled the "40-Hour Minimum Workweek Requirement for Managers." (Zeher Dep., 55-57, Plfs' Exh. 6.) This policy provides in pertinent part:

**What is the Company policy regarding Store Management workweek?**

All managers (MIT, TR, AM, ASM, SM, GM) must have a minimum of 40 hours per week. . . . If you take time off, then benefit time must be used. . . . If you are not eligible for benefit time or you have already used your benefit time, then you will need to work 40 hours. . . . Managers with less than 40 hours reported per week will be subject to disciplinary action up to and including termination of employment. Note: associates must have District Manager approval before taking vacation time or personal days.

**How should the 40-Hour Workweek Requirement be communicated?**

. . . It is especially important to discuss the policy with MIT's, TR's and newly promoted AM's because they are not eligible for vacation.

**What happens if a manager works less than 40 hours?**

. . . If a manager somehow does end the week with less than 40 hours, . . . disciplinary actions will be taken . . .

(A&F 06522-23, Plfs' Exh. 6.)  Abercrombie's Associate Handbook also confirmed the 40-hour minimum workweek requirement for Mangers, including MITs and Assistant Managers.

While working at Abercrombie, each Plaintiff always earned more than the minimum wage.[7] Plaintiffs were paid an additional half-time for all hours they worked in excess of 40 in a workweek.[8] Plaintiffs' work hours fluctuated from week to week.[9]  Although they regularly worked more than 40 hours, Frietsch and Mitchell also worked fewer than 40 hours in a workweek on some occasions.[10] Frietsch and Mitchell were paid their entire weekly salary even when they worked fewer than 40 hours per week. Plaintiffs' salary was never docked: Oros, Frietsch and Mitchell each testified that their salary was never deducted for working fewer than 40 hours or for any other reason during their employment with Abercrombie.  (Frietsch Dep. at 72; Mitchell Dep. at 120; Oros Dep. at 136, 266-67; Routh Aff. at ¶ 6, Exh. 3.)

---

[7]      Frietsch Dep. at 69, Routh Aff.¶ 6, Exh. 3; Mitchell Dep. at 123, Routh Aff.¶ 6, Exh. 2; and Oros Dep. at 135-36, Routh Aff.¶ 6.

[8]      Frietsch Dep. at 70; Mitchell Dep. at 13; Oros Dep. at 136; Routh Aff. ¶ 6, Exh. 3.

[9]      Frietsch Dep. at 70-71; Routh Aff. at ¶ 6, Exh. 3; Mitchell Dep. at 119, Routh Aff.  Oros Dep. at 36, Routh Aff. ¶ 6, Exh. 2.

[10]      Frietsch Dep. at 137-38; Routh Aff. at ¶ 6, Exh.3. Oros does not recall that he worked fewer than 40 hours any time while he was an MIT or Assistant Manager, (Oros Dep. at 136), and Abercrombie has not pointed to evidence in the record to contradict his assertion.

-8-

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence

-9-

of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6ᵗʰ Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

## III.

### A.    Parallel Application of FLSA and Ohio Minimum Fair Wage Standards Act

Plaintiffs allege that they were entitled to time-and-a-half for all hours they worked over 40 per week as Assistant Managers and Managers-in-Training. Abercrombie, on the other hand, maintains that Plaintiffs' claims under the FLSA and Ohio's corresponding wage and hour statute, should be dismissed because Plaintiffs and the putative class were properly compensated for overtime hours with Supplemental Pay.[11]    On these issues, Ohio law follows the federal FLSA. The Ohio Minimum Fair Wage Standards Act provides as follows:

> An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemptions of section 7 and section 13 of the "Fair Labor Standards Act of 1938," 52 Stat. 1060, 29 U.S.C.A. 207, 213, as amended.

O.R.C. § 4111.03(A).  Courts have uniformly held that Ohio's wage and hour law should be interpreted in accordance with the FLSA. *See, e.g., Douglas v. Argo-Tech Corp.*, 113 F.3d 67 n.2 (6ᵗʰ Cir. 1997)(noting that Ohio's wage and hour law "parallels the FLSA" and approaching the Ohio law and the FLSA in a "unitary fashion" is appropriate).  Therefore, the Court's findings with respect

---

[11]    As previously noted, Oros has no claim under the Oho Minimum Fair Wage Standard Act. See, *supra*, note 2.

to Plaintiffs' FLSA claims apply equally to Plaintiffs' claims under the Ohio Minimum Fair Wage Standards Act.

**B.      Assistant Managers and Managers-in-Training - Fluctuating Workweek Method**

Plaintiffs allege that they were entitled to compensation at a rate of 1.5 times their hourly rate for all hours over 40 per week that they worked as Assistant Managers and MITs. Abercrombie maintains that Plaintiffs were properly compensated for overtime hours with Supplemental Pay.

Abercrombie argues that its method of calculating overtime using Supplemental Pay has been specifically condoned as a variation of an acceptable manner of computing overtime under the FLSA and is known as the "fluctuating workweek method." Abercrombie contends that its method of compensating its Assistant Managers and MITs is therefore permitted under the FLSA, and that the United States Department of Labor has specifically authorized the variation of the fluctuating workweek method that it uses for Supplemental Pay.

The FLSA sets forth time and pay requirements for all employees engaged in interstate commerce. The FLSA generally requires employees to be paid at a rate of one and one-half times their "regular rate" for hours worked in excess of 40 in one week unless they are subject to certain enumerated exemptions. Specifically, the FLSA provides as follows:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours *unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the* <u>*regular rate*</u> *at which he is employed.*

29 U.S.C. § 207(a)(1)(emphasis added). The FLSA, however, does not define the term "regular rate" for purposes of the statute. The Supreme Court, in interpreting this section of the FLSA, first

announced and approved of the fluctuating workweek method of calculating an employee's "regular rate" in *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580 (1942). The fluctuating workweek method is now codified in the Department of Labor's regulations, 29 C.F.R. § 778.114.

The fluctuating workweek method is one of the various methods available to an employer for calculating overtime compensation to suit different employment needs and to ensure compliance with Section 207 of the FLSA. The regulation sets forth the fluctuating workweek method, and provides as follows:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, *for all overtime hours worked at a rate not less than one-half his regular rate of pay*. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. *Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate under the salary arrangement*.

29 C.F.R. § 778.114(a)(emphasis added).[12] The Sixth Circuit has also approved use of the method,

---

[12]    Under the fluctuating workweek method of overtime calculation, an employee receives a weekly salary as compensation for all hours worked. 29 C.F.R. § 778.114. If a salaried employee works more than 40 hours in a week, her salary is generally divided by the number of hours worked that week to determine the "regular rate" of pay for that week. 29 C.F.R. § 778.114. The employee, by receiving a salary for all hours worked, is paid her "regular rate" of pay for all hours worked that week, including the hours over 40. The individual must also receive additional compensation equal to half the "regular rate"

stating, "[a]lthough the fluctuating work week method of overtime compensation results in lower earnings per hour as the number of hours increases, the [Fair Labor Standards] Act permits its implementation." *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 647-48 (6th Cir. 1986); *see also Fakouri v. Pizza Hut of Am., Inc.*, 824 F.2d 470, 471-73 (6th Cir. 1987)(recognizing fluctuating workweek computation under FLSA).

Abercrombie points out that United States Department of Labor has specifically authorized the variation of the fluctuating workweek method its uses in its Supplemental Pay policy, which Abercrombie notes is more generous to employees than the standard fluctuating workweek method. See Department of Labor Field Operations Handbook § 32b04b. (Defs' Mot., Exh. C.) The Field Operations Handbook states in pertinent part that "[i]f the employer to avoid weekly computations chooses to pay extra half-time based on the salary divided by 40 hours, such a method is permissible." *Id.* Thus, under the variation of the fluctuating workweek method that it uses, Abercrombie determines the "regular rate" by dividing the weekly salary by 40, rather than the actual, fluctuating, greater than 40 hours worked, and divides that result by two. Accordingly, the variation used by Abercrombie complies with 29 C.F.R. 778.114, which requires that an employer provide overtime compensation at a "rate not less than one-half his regular rate of pay."

Abercrombie, however, may not simply elect to pay the lower overtime rate under 29 C.F.R. § 778.114. The regulation requires that four conditions be satisfied before an employer may do so:

   (1)     the employee's hours must fluctuate from week to week;

   (2)     the employee must receive a fixed salary that does not vary with the number

---

of pay for each hour worked in excess of 40. Thus, because the individual has been paid a "regular rate" for all hours worked, plus one-half that rate for hours over 40, the individual receives one and one-half times her "regular rate" of pay for each hour worked in excess of 40, as is required under the FLSA. *Id.*

of hours worked during the week (excluding overtime premiums);

(3)     the fixed amount must be sufficient to provide compensation every week at a regular rate that is at least equal to the minimum wage; and

(4)     the employer and employee must share a "clear mutual understanding" that the employer will pay that fixed salary regardless of the number of hours worked.

29 C.F.R. § 778.114(a), (c); *Highlander,* 805 F.2d at 647.  The Court turns now to assess whether each of these four conditions has been met with respect to Mitchell, Frietsch and Oros.

### (1.)     *The employee's hours must fluctuate from week to week*

The parties do not dispute that Plaintiffs worked varying hours *above* 40 per week.  Plaintiffs contend that because Abercrombie required its employees to work a minimum of 40 hours a week, Abercrombie should not be permitted to take advantage of the fluctuating workweek method.  More particularly, Plaintiffs assert that hours do not "fluctuate" for purposes of the rule, if the workweek hours in the computation do not fall both above and below 40.

In *Condo v. Sysco Corp.*, 1 F.3d 599, 602 (7th Cir.1993), the court upheld a defendant's application of the fluctuating workweek method of compensation to an employee who worked at least 40 hours per week every week.  In *Condo*, only the amount of overtime varied and employees were required to work a full 40 hour week.  Other courts have reached the same conclusion when faced with similar arguments. *Aiken v. County of Hampton*, No. 97-2328, 1998 WL 957458, *3 (4th Cir. Sept. 22, 1998); *Evans v. Lowe's Home Centers, Inc.*, No. 3:CV-03-0438, 2004 U.S. Dist. LEXIS 15716, at *13-14 (M.D. Pa. June 17, 2004); *Teblum v. Eckerd Corp.*, No. 2:03CV495FTM33DNF, 2006 WL 288932 (M.D. Fla. Feb. 7, 2006); *Newsom v. NPC Int'l, Inc.*, No. 03-2068 ML/V, 2003 WL 23849758, *4 (W.D. Tenn. Sept. 29, 2003).  Each of these courts rejected

the claimants' argument that Section 778.114(a) requires that an employee's hours fluctuate above and below 40 per week for the fluctuating workweek method to apply.

Moreover, in an application note demonstrating the proper method to calculate the rate under the formula, Section 778.114 itself provides an example of fluctuating workweeks in which the hypothetical employee works 40, 44, 48 and 50 hours per week. 29 C.F.R. § 778.114(b).[13] Thus, the example assumes that the employee worked no fewer than 40 hours in a week and make no implication that an employee's hours must fluctuate both above and below 40. Id.

The Court concludes that neither existing authority nor the language of 29 C.F.R. § 778.114(a) supports Plaintiffs' argument that an employee's hours much fluctuate above and below 40 for the fluctuating workweek method of computing overtime compensation to apply.[14] Because

---

[13]      Subsection (b) of the regulation provides in full:

The application of the principles above stated may be illustrated by the case of an employee whose hours of work do not customarily follow a regular schedule but vary from week to week, whose overtime work is never in excess of 50 hours in a workweek, and whose salary of $250 a week is paid with the understanding that it constitutes his compensation, except for overtime premiums, for whatever hours are worked in the workweek. *If during the course of 4 weeks this employee works 40, 44, 50, and 48 hours*, his regular hourly rate of pay in each of these weeks is approximately $6.25, $5.68, $5, and $5.21, respectively. Since the employee has already received straight-time compensation on a salary basis for all hours worked, only additional half-time pay is due. For the first week the employee is entitled to be paid $250; for the second week $261.36 ($250 plus 4 hours at $2.84, or 40 hours at $5.68 plus 4 hours at $8.52); for the third week $275 ($250 plus 10 hours at $2.50, or 40 hours at $5 plus 10 hours at $7.50); for the fourth week approximately $270.88 ($250 plus 8 hours at $2.61 or 40 hours at $5.21 plus 8 hours at $7.82).

29 C.F.R. § 778.114(b)(emphasis added).

[14]      Plaintiffs seem to argue that their hours did not fluctuate because Abercrombie intended that they work a regular schedule, broken down by days and shifts. Courts have also rejected this argument that the term "fluctuate," as it is used in the regulation, means irregular or unpredictable hours. *See Flood v. New Hanover County*, 125 F.3d 249, 253 (4th Cir.1997) (finding that employees hours fluctuated for purposes of Section 778.114 even though they worked pursuant to a fixed predictable schedule above 40 per week); *Griffin v. Wake County*, 142 F.3d 712, 715 (4th Cir.1998) (finding that

-15-

the parties do not dispute that Plaintiffs' hours as MITs and Assistant Mangers varied, albeit above

40, Abercrombie has established the first requirement of 29 C.F.R. § 778.114.

### (2) *The employee must receive a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums)*

Plaintiffs assert that their salary was not fixed, but rather was subject to docking when they

worked fewer than 40 hours in a week. In *Auer v. Robbins*, 519 U.S. 452, 452 (1997), in the context

of examining whether employees were properly paid on a salaried basis to meet the test for exempt

status, the Supreme Court addressed the standard necessary to show whether a fixed salary is

"subject to reduction because of variations in the quality or quantity of the work performed." The

Supreme Court, in deferring to the Secretary of Labor's interpretation of "salary," stated in pertinent

part:

> That standard [of showing whether a fixed salary is subject to docking] is met, the
> Secretary says, if there is either an actual practice of making such deductions or an
> employment policy that creates a "significant likelihood" of such deductions. The
> Secretary's approach rejects a wooden requirement of actual deductions, but in their
> absence it requires a clear and particularized policy – one which "effectively
> communicates" that deductions will be made in specified circumstances. This avoids
> the imposition of massive and unanticipated overtime liability (including the
> possibility of substantial liquidated damages ... ) in situations in which a vague or
> broadly worded policy is nominally applicable to a whole range of personnel but is
> not "significantly likely" to be invoked against salaried employees.

*Auer*, 519 U.S. at 461.

The evidence of record confirms that Plaintiffs received a fixed salary regardless of how

many hours they worked. Plaintiffs have failed to create an issue of fact by testifying, without more,

that they believed they would be docked in any given week they worked less than 40 hours.

---

employees' work schedule fluctuated in a predictable manner, rather than in a wholly irregular and
unpredictable manner, did not preclude employer from paying overtime compensation according to
"fluctuating workweek" plan).

Plaintiffs emphasize Abercrombie's policy regarding the "40-Hour Minimum Workweek Requirement for Managers."[15] Plaintiffs argue that their failure to work, *i.e.*, be physically present in the store, at least 40 hours per week would result in disciplinary consequences, including, Plaintiffs say, docking. According to Plaintiffs, this policy of disciplining managers who did not work 40 hours is evidence that their salaries were not fixed but rather were subject to docking. That Abercrombie's policy requiring that MITs and Assistant Managers code 40 "hours" of combined benefit and work time per week subject to disciplinary action does not show a "significant likelihood" that Plaintiffs' fixed salaries were subject to docking. Plaintiffs have shown neither "actual deductions," nor a "clear and particularized policy" which "'effectively communicates' that deductions will be made in specified circumstances." *Auer*, 519 U.S. at 461. None of the documents adduced by Plaintiffs indicate that MITs or Assistant Managers will be docked in salary under circumstances outside the scope of 29 C.F.R. § 778.114.[16]

---

[15]     Abercrombie's Handbook and orientation documents do not, as Plaintiffs claim, require that Assistant Mangers and MITs work 40 hours every week, even if they were ill or otherwise needed time off. Although the Handbook states that Assistant Managers and MITs must code in 40 "hours" per week, the Handbook also states that "hours" include "hours coded as benefit time, such as vacation or personal days." (E.g., Mitchell Dep., Exh. 5, at p. 38.) The Handbook also indicates that, depending on which month they were hired, Assistant Managers and MITs in their first year of employment are eligible for up to two weeks of vacation, three personal days, and five sick days. (*Id.* at pp. 51-52.) Assistant Managers and MITs thus were permitted to work fewer than 40 hours in a week but were instructed to code in their allotted benefit time for days that they were absent.

[16]     Moreover, Abercrombie's practice of requiring employees to use benefit time to meet 40 hours in a week is permissible under the FLSA. For salary compensation, the U.S. Department of Labor agrees that employers may charge partial-day or full-day absences against an employee's accrued leave time as long as employees receive their full salary:

Where an employer has bona fide benefit plans for vacation, personal or sick leave, it is permissible to substitute or reduce the accrued leave in the plans for the time an employee is absent from work, even if it is less than a full day, without affecting the salary basis of payment, if by substituting or reducing such leave the employee receives in payment an

Instead, each Plaintiff received a fixed salary regardless of how many hours he or she worked. Plaintiffs concede that they never earned less than their salary and that their pay was never docked. Abercrombie's pay and time records for Plaintiffs also establish that they always received their full salary. In weeks that Plaintiffs worked fewer than 40 hours in a workweek, they received their full salary, and their accrued paid benefit time was reduced by the number of hours below 40. In sum, Plaintiffs receive a fixed salary that did not vary with the number of hours worked during the week.

> **(3)    *The fixed amount must be sufficient to provide compensation every week
> at a regular rate that is at least equal to the minimum wage***

The parties do not dispute that Plaintiffs earned more than minimum wage the entire time that they were employed by Abercrombie as MITs and Assistant Managers. This element, therefore, is not at issue.

> **(4)    *The employer and employee must share a "clear mutual understanding"
> that the employer will pay the fixed salary regardless of the number of
> hours worked***

Section 778.114 applies only if there is a "clear mutual understanding" that the employer will pay a fixed salary to the employees regardless of the number of hours worked. *Bailey v. County of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996). The fluctuating workweek method may not be used "unless the employee clearly understands that the salary covers whatever hours the job may demand

---

amount equal to his or her guaranteed salary.

WH Admin. Op., 1997 WL 970567 (July 23, 1997); *see* WH Admin. Op., 1992 WL 845094 (Apr. 14, 1992); WH Admin. Op., 2001 WL 1558766 (Feb. 16, 2001); *see also Schaeffer v. Indiana Michigan Power Co.*, 358 F.3d 394, 400 (6th Cir. 2004) (rejecting plaintiff's argument that he was not paid a salary because "he must account for at least forty hours of work each week on his timesheet and must make up partial-day absences by either working extra hours on another day or using part of a vacation day").

-18-

in a particular workweek." 29 C.F.R. § 778.114(c)

"[T]he existence of such an understanding may be 'based on the implied terms of one's employment agreement if it is clear from the employee's actions that he or she understood the payment plan in spite of after-the-fact verbal contentions otherwise.'" *Mayhew v. Wells*, 125 F.3d 216, 219 (4th Cir. 1997) (quoting *Monahan v. County of Chesterfield*, 95 F.3d 1263, 1281 n.21 (4th Cir. 1996)). "[A]n employer can also demonstrate the existence of this clear mutual understanding from employment policies, practices, and procedures." *Monahan,* 95 F.3d at 1275, n.12.

In *Highlander  v. KFC Nat'l Management Co.*, 805 F.2d 644, 645-46, 648 (6th Cir. 1986), the Sixth Circuit affirmed a district court's conclusion that an employee understood the manner in which her overtime compensation was being calculated. 805 F.2d at 648. The court reached that conclusion because the employee had been given a form that explained the pay system and provided examples of how that system would be applied; the employee had signed a statement acknowledging that she had received such an explanation; the employee had presented no evidence at trial indicating that she had not understood the pay plan; and the employee's testimony had been incredible. *Id.* at 645-48.  Similarly, in *Griffin v. Wake County*, 142 F.3d 712, 716 (4th Cir. 1998), the Fourth Circuit held that Section 778.114 only requires employees to understand the essential feature of the fluctuating workweek plan, and that the employer is not required to do more than specifically tell him or her how the payroll system works, when the compensation system can be gleaned from policies, practices, and procedure.

Here, the evidence of the record indicates that Plaintiffs knew and understood that their salary was to compensate them for their straight time 40 hours of work during any given workweek and that, for hours in excess of 40 per week, they would receive Supplemental Pay at one-half their rate

of pay.[17] Plaintiffs were told by their hiring managers when they were offered the position of MIT

that they would be paid a salary. Each was also told that, in addition to their salary, he or she would

receive half-time pay when working over 40 hours in a week, although Plaintiffs testified that they

believed this amount was a bonus. Each Plaintiff received a copy of Abercrombie's Associate

Handbook which contain sections relating to compensation, including Supplemental Pay. Moreover,

as Assistant Managers, Plaintiffs had access to the Orientation Checklist, which states that "Assistant

Managers receive a weekly base salary for all hours worked each week. . . [and] [h]ours over 40 per

week are paid at the Supplemental Pay rate." As Assistant Mangers, Plaintiffs were responsible for

learning, explaining and enforcing all of the policies and procedures set forth in the Handbook to

new employees who worked in their stores. Furthermore, Plaintiffs received paychecks and paystubs

throughout their employment with Abercrombie, which were "regular lesson[s] . . . about how the

fluctuating workweek plan operates." *Griffin*, 142 F.3d at 716-17.

---

[17]     Abercrombie objects to the introduction of evidence introduced through Frietsch's
deposition testimony that a MIT, "Courtney," once told her that she was not paid her full salary.
Abercrombie maintains that Frietsch's testimony about Courtney is hearsay and thus inadmissible for
purposes of summary judgment, citing *Sperle v. Michigan Dept. of Corrs*, 297 F.3d 483, 495 (6th Cir.
2002) (party opposing motion for summary judgment cannot use hearsay to create genuine issue of
material fact). Plaintiffs counter in their Sur-Reply, however, that they do not offer Courtney's statement
for the truth of the matter asserted. While the Court is not convinced such testimony is otherwise
admissible, this evidence is arguably admissible for the limited purpose of indicating Frietch's own state
of mind when she personally observed Courtney and heard her report that she had not received her full
salary. This evidence relates to Frietch's understanding of whether she would be docked pay.

        Nonetheless, the Court finds that this evidence does not create a genuine or material issue of fact.
Frietsch knew no details, including Courtney's surname, whether Courtney followed up with a Store
Manager, whether any alleged mistake was rectified, or whether Courtney was simply mistaken. (Frietsch
Dep. at 138-43.) Given the complete lack of details, particularly compared to the absence of any
competent evidence of docking, Frietsch's testimony does not bar summary judgment. Moreover,
Frietsch conceded she knew of no other facts to suggest that Abercrombie docked the salaries of MITs or
Assistant Manger. (Frietsch Dep. at 144.)

Plaintiffs protest, however, that they thought the Supplemental Pay was a bonus rather than compensation for overtime. That Plaintiffs characterize the pay as a bonus rather than overtime does not necessarily vitiate their understanding that they were being compensated for 40 hours of work a week plus an additional payment in the form of Supplemental Pay for each hour they worked over 40. An FLSA challenge to Abercrombie's entire pay system cannot proceed on the basis of employee confusion about the denomination and ministerial details of the Company's administration the fluctuating workweek plan, particularly when such employees are Assistant Managers and Managers-in-Training.

The Court is satisfied that there is no genuine issue of material fact that Abercrombie properly elected to pay the lower overtime rate under 29 C.F.R. § 778.114 to Plaintiffs when they were MITs and Assistant Managers because their work hours fluctuated from week to week; they received a fixed salary irrespective of the number of hours they worked during the week; they were at all times paid more than the minimum wage; and they had a clear mutual understanding that Abercrombie would pay their fixed salary regardless of the number of hours worked. For these reasons, Abercrombie's Motions for Summary Judgment, as they relate to the fluctuating workweek method of overtime compensation are **GRANTED**.

**C.      Store Managers – Executive Exemption Defense**

Abercrombie classifies its Store Managers as "exempt" for purposes of the FLSA and does not pay them any overtime compensation whatsoever. Plaintiff Oros asserts that Abercrombie improperly classified him as an exempt executive and claims that Abercrombie is liable to pay him for each hour over 40 he worked as a Store Manager.

-21-

Section 13(a)(1) of the FLSA provides an exemption from the Act's overtime requirements for an employee employed in an executive, administrative, or professional capacity. 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.0.[18] To be eligible for the executive exemption:

(1) The employee must be compensated on a salary basis at a rate of not less than $250 per week … exclusive of board, lodging or other facilities;

(2) The employee's primary duty must consist of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; and

(3) The employee must customarily and regularly direct the work of two or more other employees.

29 C.F.R. § 541.1. This is known as the "short test" for the executive exemption.

***(1) The employee must be compensated on a salary basis at a rate of not less than $250 per week***

The parties do not dispute the first element that Oros was compensated on a salary basis at a rate of more than $250 per week. Indeed, Oros' annual salary as a Store Manager was $32,000 or $619.39 per week. Thus only the second and third factors are at issue with respect to whether Abercrombie properly classified Oros as exempt.

***(2) The employee's primary duty must consist of management***

### a.) Oros' Duties as Store Manager

As Store Manager, Plaintiff was the highest ranking employee in the stores he managed on a day-to-day basis. He was responsible for more than 60 employees and all matters that occurred in those stores. His management responsibilities as Store Manager for Abercrombie included:

---

[18] Certain FLSA regulations were slightly clarified through amendments that became effective August 21, 2004. Plaintiffs do not rely on these amendments and instead rely on the pre-August 2004 regulations that were effective during the time Oros was employed as a Store Manager.

- *Recruiting*. Oros was required to meet a daily recruiting goal. He recruited Brand Representatives (essentially sales associates) and management candidates at various places, including his own stores, the malls where his stores were located, and on college campuses.

- *Interviewing and hiring of potential employees*. Oros conducted weekly interviews of potential Brand Representatives and made decisions regarding whom to hire. While at times he delegated the interviewing duties to Assistant Mangers working under him, Oros personally conducted most of the weekly group interviews in the stores he managed. Oros asserts, however, that his ability to hire any individual was constricted by Abercrombie's "Look Policy," in that he was required to hire good-looking individuals who had certain profiles that fit with the Abercrombie image.

- *Discipline and firing of employees*. Oros had the authority to discipline associates and to issue written warnings to them. He also had authority to fire hourly associates, and did so. Oros, however, claims that his District Manager could overrule his decisions and, in one instance, interfered with his disciplinary and firing decisions.

- *Recommending promotion of employees*. For example, Oros recommended the promotion of a Brand Representative to the position of stock lead.

- *Conducting orientation and training*. MITs shadowed Oros to learn how to manage. When he had multiple MITs working under him, Oros rotated their schedules so that each shadowed him and would be exposed to different types of management duties.

- *Scheduling of employees*. Oros was responsible for preparing the employees' schedule each week and had authority to adjust the schedule to accommodate employees or to handle busy shopping days. Oros, however, argues that he had no discretion in scheduling because Abercrombie provided preprinted forms for scheduling and placed limits on the number of associate hours he could schedule each week. He characterizes his role as perfunctory, although he testified that he scheduled between 25 and 30 Brand Representatives per week and had the authority to adjust the schedule based on his perceived needs of the store.

- *Conducting and attending management meetings*. Oros conducted weekly management meetings with Assistant Managers and MITs during which he discussed issues such as scheduling, recruiting, and problems in the store. He also attended quarterly management meetings attended by other Store Managers, General Managers and District Managers.

- *Direction of employees and delegation of duties*. Oros delegated duties to the Assistant Managers working under him, including interviewing job applicants. He also determined how to assign associates working under him to accomplish the tasks that needed to be completed in the store. Oros had the discretion to choose which of his employees were "zoned" in different locations in the store such as in the front room or as cashier. Oros asserts, however, that he was not free to direct where the employees in his store worked

-23-

because of Abercrombie's coverage or zoning requirements compelled him to place the best looking male in the store in the front of the room.

- *Enforcement of Company policies*. Oros was required to understand Company policies so he could communicate them effectively and answer questions regarding them. Oros maintains, however, that he had no discretion with respect to the Abercrombie "Look Policy" regarding personal appearance.

- *Loss prevention*. Oros was held accountable for the rate at which merchandise was stolen from the store and was subject to discipline if the rate was too high.

- *Maintaining personnel files*. Oros had responsibility for completing personnel forms and ensuring that appropriate forms were maintained.

- *Handling customer complaints*. Oros responded to customer complaints regarding application of polices concerning return of merchandise.

Oros argues generally that his managerial functions as a Store Manager were virtually identical to the functions of a non-exempt Assistant Manager, to whom Abercrombie paid overtime using the Supplemental Pay method. For example, as an Assistant Manager, he recruited, hired, and trained new employees. Oros testified that MITs, Assistant Managers and Store Managers alike were responsible for enforcing the "Abercrombie Look" policy for employee appearance and all these levels of management closed the store at the end of the day. Oros points out that Assistant Managers were *de facto* Store Managers during shifts when there was no Store Manager in the store, including all day Sunday.

Oros maintains that, when he was Store Manager, he worked along-side other associates more than he actually supervised them. He performed manual, routine functions, such as folding or stocking merchandise, with other non-managerial employees. He had no responsibility for ordering inventory, negotiating rent, advertising, setting wages or salaries, or making strategic business decisions pertaining to the stores in which he worked.

-24-

Oros asserts that Abercrombie stores were micro-managed through administrators and human resources departments at the Corporate Home Office and District Managers. Plaintiff maintains that Abercrombie's Corporate Home Office and District Managers virtually controlled everything and communicated with Oros via transmissions called "Crombie," "The Program," "Ops Checklist," "the Planner," "Floor Sets," and "Updates."[19] These programs ensured continuity and routine in every Abercrombie store. According to Oros, Corporate Home Office and District Managers controlled his every task during any given day through these programs and procedures.

### b.) The Executive Exemption

Abercrombie bears the burden of establishing that Oros qualifies for the executive exemption. *Martin v. Indiana Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004). Moreover, FLSA exemptions relating to overtime must be "narrowly construed against the employers seeking to assert them." *Arnold v. Ben Kanowski, Inc.,* 361 U.S. 388, 392 (1960); *Martin*, 318 F.3d at 578. The burden is on the employer to establish each element of the FLSA exemption by a preponderance of the clear and affirmative evidence. *Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512, 515 (6th Cir. 2004)(citing *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 691 n.4 (6th Cir. 2001)).

To satisfy the second factor required to prove an employee is properly classified as exempt, the employee's primary duty must be the "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.1. The FLSA regulations provide the following explanation of "primary duty":

---

[19]     The Court notes that Abercrombie did not implement many of the procedures Oros relies upon, including the Program and other processes that were designed to provide a degree of routine and predictability for daily operations in Abercrombie's nationwide stores until after Oros left the employ of the Company. (Plfs' Exh. 7, 9 & 10.)

A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. ... Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

29 C.F.R. § 541.02. Exempt "management" work includes, but is not limited to, activities such as:

interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; ... [and] providing for the safety and security of the men and the property.

29 C.F.R. § 541.102. Importantly, the fact that Oros' title was Store "Manager" is not dispositive:

"[a] job title job title alone is insufficient to establish the exempt status of an employee." 29 C.F.R.

§ 541.102.

The regulations provide additional clarification of the primary duty test that relates to the

claims at issue in this case at 29 C.F.R. § 541.103, which provides in part:

... [I]n some departments, or subdivisions of an establishment, an employee has broad responsibilities similar to those of the owner or manager of the establishment, but generally spends more than 50 percent of his time in production or sales work. While engaged in such work he supervises other employees, directs the work of warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require. He will be considered to have management as his primary duty.

-26-

### c.)    Oros' primary duty as Store Manager was management

Construing the facts in a light most favorable to Oros as the non-moving party, the Court concludes that Abercrombie has established that Oros' primary duty was management.  The weight of federal authority supports the conclusion that Oros, like many retail store managers, was exempt from the overtime requirements of the FLSA.

Oros attempts to minimize the relative importance of the tasks he performed and to understate his authority to discharge managerial or discretionary duties. For instance, Oros contends that Abercrombie's standardization and uniformity of procedures and policies with respect to store layout, scheduling, and other matters eliminated his discretion and rendered him non-exempt. This argument, however, has been rejected by federal courts interpreting the executive exemption in the store-manager context. *See, e.g., Murray v. Stuckey's, Inc.* 50 F.3d 564, 570 (8th Cir. 1995)("*Stuckey's* II)("Most if not all nationwide companies with multiple outlets establish standardized procedures and policies to guide individual store managers. This practice may circumscribe but it does not eliminate the discretion of the on-site manager … who is responsible for day-to-day operations."); *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 619 (8th Cir. 1991)("*Stuckey's* I)("Like other courts that have considered the question, we believe that the manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity.")

Oros argues that he was non-exempt because a significant portion of his job duties as a Store Manager consisted of carrying out and complying with directives from higher level management. This argument, however, is similarly unavailing.  Federal courts examining the application of the

-27-

executive exemption to store managers have repeatedly rejected similar arguments from plaintiff-store managers. *See, e.g., Donovan v. Burger King*, 672 F.2d 221, 226 (1st Cir. 1982) (*Donovan* I) ("The fact that Burger King has well-defined policies, and that tasks are spelled out in great detail is insufficient to negate this conclusion [that the managers are exempt]. Ensuring that company policies are carried out constitutes the very essence of supervisory work.")(internal quotation omitted).

That Oros' District Managers regularly visited his store and retained authority to override certain of his management decisions did not undermine his day-to-day authority, as the highest ranking manager on job site, or render him non-exempt. "[A]ctive supervision and periodic visits by a regional manager do not eliminate the day-to-day discretion of the on-site store manager." *Stuckey's* II, 50 F.3d at 570. Federal courts have rejected such arguments in circumstances where the control exerted by a district manager was far greater than that exerted over Oros. *See, e.g., Haines v. Southern Retailers, Inc.*, 939 F. Supp. 441, 450 (E.D. Va. 1996)(noting store manager was exempt despite fact that she could not hire or fire without upper management's approval and was subject to rigid supervision and frequent visits by upper management).

The fact that Oros spent much of his time performing general, manual tasks does not necessarily negate a finding that he qualifies for executive exemption. The Court is required to, and has in this instance, considered all of the circumstances surrounding Oros' job functions. The proportion of time spent on managerial tasks is but one measure in determining whether Oros primarily performed exempt work:

> The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work

will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors [mentioned above] support such a conclusion.

29 C.F.R. § 541.700(b); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1114 (9th Cir. 2001)(executive exemption does not fail "merely because the proportion of time spent on exempt managerial tasks is less than fifty percent, where, as here, managerial duties are packaged in employment with non-managerial tasks, and the management function cannot readily and economically be separated from the nonexempt tasks.")

In sum, Abercrombie has demonstrated by a preponderance of the clear and affirmative evidence that Oros' primary duty as Store Manager was to perform managerial, exempt tasks. Viewing all the facts in this particular case in a light most favorable to Oros, emphasizing and analyzing the character of his job, the Court concludes that Oros' main and most important duties were those involving managerial work.

### (3) *The employee must customarily and regularly direct the work of two or more other employees*

Finally, in order to invoke the protections of the executive exemption, Oros must have customarily and regularly directed the work of two or more other employees. Whether a employee "customarily and regularly" directs the work of two or more employees means "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' include work normally and recurrently performed in every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

Despite his argument that Corporate Home Office and his District Manager directed the work

of his employees, Oros testified that, as Store Manager, he supervised approximately 60 associates at each store that he managed, including three or more full-time MITs and Assistant Managers. Oros provided numerous examples of the ways in which he directed the work of the employees working under him, including instances in which he directed and delegated duties; trained and provided orientation for new employees; cautioned and counseled associates regarding Abercrombie policies; and conducted meetings with Assistant Managers and MITs.

A reasonable trier of fact could only conclude that Oros directed the work of two or more employees. As such, this factor weighs in favor of Abercrombie's classification of Oros as exempt.

### (4)    *Conclusion*

Oros was compensated on a salary basis at a rate of not less than $250 per week. His primary duty at Store Manager of Abercrombie was to manage. He directed the work of two or more other employees. Oros qualified for the executive exemption under 29 U.S.C. § 213(a)(1) and 29 C.F.R. § 541.1. As such, Abercrombie is entitled to summary judgment as to this claim; Abercrombie's Motion for Summary Judgment as to Oros' claim regarding the executive exemption is therefore **GRANTED**.

### D.    **Claims Against Abercrombie & Fitch Co.**

Defendant, Abercrombie & Fitch Co., is a holding company and not an operating company. It has no employees, no payroll and operates no stores. (Routh Aff. at ¶ 7.) Under the FLSA, the term "employee" means "any individual employed by an employer," and "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d) & (e). Similarly, in Ohio, "employer" means "any individual, partnership, association, corporation, business trust, or any person or group of persons, acting in the interest of

-30-

an employer in relation to an employee. . . ." O.R.C. § 4111.01(C).

Abercrombie & Fitch Co., is not an employer under the FLSA, 29 U.S.C. § 203(d), nor is it an employer under the Ohio Act, O.R.C. 4111.01(C). Both statutory definitions require the existence of an employer-employee relationship. Plaintiffs have come forward with no evidence to contradict Abercrombie & Fitch Co.'s assertion that it is not an "employer." Accordingly, all claims against Abercrombie & Fitch Co. are **DISMISSED**.

## IV.

Consistent with the foregoing, Defendants' Motion for Summary Judgment on the Claims of Jennifer Frietsch (Doc. #57) is **GRANTED**; Defendants' Motion for Summary Judgment on the Claims of Melissa Mitchell (Doc. #58) is **GRANTED**; and Defendants' Motion for Summary Judgment as to Plaintiff Scott Oros' Claim Under Count One of the Amended Complaint (Doc. #59) is **GRANTED**. The Clerk is **DIRECTED** to enter judgment in favor of Defendants in Case No. C2: 04-306. The Court notes that Defendants have not moved for summary judgment in *Fuller v. Abercrombie & Fitch Co.*, Case No. C2: 05-596, and that case accordingly remains pending.


**IT IS SO ORDERED.**


3-31-2006
_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**